IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-02084-JAP-LFG

FOUR CORNERS NEPHROLOGY ASSOCIATES, P.C.,
a New Mexico professional corporation; and
MARK F. BEVAN, M.D.,

      Plaintiffs,

vs.

MERCY MEDICAL CENTER OF DURANGO, a
Colorado not-for-profit corporation,

      Defendant.

## MEMORANDUM OPINION AND ORDER

In their Second Amended Complaint (Doc. No. 50), Plaintiffs asserted the following causes

of action against the Defendant:

| | |
|---|---|
| Count I: | Unlawful Monopolization in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. |
| Count II: | Attempted Monopolization in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. |
| Count III: | Unlawful Monopolization and Attempted Monopolization in violation of the Colorado Antitrust Act of 1992, C.R.S. § 6-4-101–122. |
| Count IV: | Illegal Conspiracies and Exclusionary Practices in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. |
| Count V: | Illegal Conspiracies and Exclusionary Practices in violation of the Colorado Antitrust Act of 1992, C.R.S. § 6-4-101–122. |
| Count VI: | *Per Se* Illegal Tying Arrangement in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. |
| Count VII: | *Per Se* Illegal Tying Arrangement in violation of the Colorado Antitrust Act of 1992, C.R.S. § 6-4-101–122. |
| Count VIII: | Violation of the Colorado Consumer Protection Act, C.R.S. § 6-1-105(1)(n)(III). |
| Count IX: | Colorado Common Law Civil Conspiracies; |

Count X: Tortious Interference with Existing and Prospective Contractual Relations;

Count XI: Promissory Estoppel;

Count XII: Arbitrary, Capricious and Unreasonable Denial of Hospital Privileges.

On December 6, 2006, Defendants filed Defendant's Motion for Summary Judgment (Doc. No. 88). On January 5, 2007, Plaintiffs filed Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (Doc. No. 119). On January 22, 2007, Defendant filed a Reply Brief in Support of Motion for Summary Judgment (Doc. No. 131). On June 1, 2007, the Court entered an Order on Motion to Strike (Doc. No. 164) permitting additional briefing. In response to the order, on September 28, 2007, Plaintiffs filed Plaintiffs' Supplemental Brief in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 169), and on October 29, 2007, Defendant filed Mercy Medical Center's Response to Plaintiffs' Supplemental Brief in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 170). Following the untimely death of the Hon. Phillip S. Figa, this case was reassigned to Senior United States District Judge James A. Parker, of the District of New Mexico, on January 15, 2008 (Doc. No. 174).

Having considered the parties' arguments, the admissible evidence in the record, and the applicable law, the Court has decided to grant the Defendant's Motion for Summary Judgment as to all of Plaintiffs' above-enumerated causes of action with the exception of Plaintiffs' claims (Counts VI and VII) that Defendant engaged in an illegal tying arrangement in violation of § 1 of the Sherman Act and the Colorado Antitrust Act of 1992. The Court will defer ruling on Defendant's Motion for Summary Judgment as it relates to Plaintiffs' causes of action (Counts VI and VII) for an alleged illegal tying arrangement in violation of the Sherman Act and the Colorado Antitrust Act of 1992 until after a hearing on March 10, 2008.

# I. BACKGROUND

Plaintiffs filed this action against Mercy Medical Center of Durango ("Mercy") after Mercy entered into an exclusive contract with Dr. Mark Saddler ("Dr. Saddler") for the provision of nephrology physician services at Mercy and then terminated Plaintiff Mark F. Bevan, M.D.'s ("Dr. Bevan") staff privileges at Mercy. The following facts are either undisputed or viewed in the light most favorable to Plaintiffs, the non-movants.

## A. The Parties

Plaintiff, Dr. Bevan, is a nephrologist who has been providing nephrology physician services in the "Four Corners" area—an area encompassing the northwest corner of New Mexico, the southwest corner of Colorado, the southeast corner of Utah, and the northeast corner of Arizona—since 1982. Sec. Am. Compl. (Dkt. # 50) ¶¶ 9, 13; Bevan Depo., Ex. 17 to Def.'s S.J. Br. (Dkt. # 94), at 18–21. Plaintiff Four Corners Nephrology Associates ("FCNA") is Dr. Bevan's practice group. FCNA's principal office is located in Farmington, New Mexico, which is the largest community in the Four Corners area. Sec. Am. Compl. ¶ 3; *see* Bevan Depo. at 30. In addition to his nephrology practice, Dr. Bevan jointly owns and operates, with a company named DaVita, Inc. ("DaVita"), seven outpatient dialysis centers in the Four Corners area, including one in Farmington. Bevan Depo. at 85–86. Defendant Mercy is a not-for-profit hospital located in Durango, Colorado. Sec. Am. Compl. ¶ 5.

## B. Nephrology Services in Durango and the Four Corners Area

Nephrology is the practice of medicine that deals with kidney function and disease. Nephrology physician services include both inpatient care of patients requiring hospitalization and outpatient care of individuals with kidney disease. Sec. Am. Compl. ¶ 15. Nephrology patients

who develop end-stage renal disease must undergo dialysis treatment, which they may generally receive at outpatient dialysis centers, approximately three times a week. *Id.*; Bevan Depo. at 115. The majority of the income of a nephrology practice is generated by providing physician services to patients who undergo dialysis treatment. *See* Bevan Depo. at 203 (agreeing that dialysis is "the money-making part of the practice").

A dialysis patient who is admitted to a hospital may require dialysis treatment while in the hospital. *See* Sec. Am. Compl. ¶ 16. Dialysis patients who are admitted to Mercy are generally cared for on a Diagnostic Related Group fee-for-service basis. Aff. of Chuck Tramontana, Mercy's Director of Employed Physician Practices, Ex. 12 to Def.'s S.J. Br., ¶ 4. In other words, a single payment based on the diagnosis for which the patient was admitted—whether kidney-related or not—covers all hospital care for the patient, including any dialysis services that are provided. *Id.*

Prior to 2000, Plaintiff FCNA was the only nephrology practice located in the Four Corners area. Aff. of Dr. Mark Saddler, Ex. 11 to Def.'s S.J. Br., ¶¶ 4–5. In 2000, two former FCNA associates opened a competing nephrology practice, San Juan Nephrology, in Farmington. *Id.* ¶ 3. Prior to 2005, there were no dialysis services—inpatient or outpatient—available in Durango. Aff. of Kirk Dignum, Mercy's President and CEO, Ex. 6 to Def.'s S.J. Br., ¶ 3. Dr. Bevan treated his Durango patients in Farmington, which is approximately 45 to 50 miles from Durango. Bevan Depo. at 60, 115. Dr. Bevan's dialysis patients from Durango received outpatient dialysis services at the dialysis center in Farmington,[1] and inpatient dialysis was provided at San Juan Regional

---

[1] Dr. Bevan and DaVita had ongoing discussions about developing an outpatient dialysis center in Durango; ultimately, however, the venture never went forward. Bevan Aff., Ex. A3 to Pl.s' Opp., ¶¶ 12–13; Bevan Depo. at 84–85.

Medical Center, a hospital in Farmington where Dr. Bevan has active staff privileges.  *Id.* at 60; *see also* Bevan Depo. Ex. 22.

In 2003, Mercy began to consider providing nephrology physician services in Durango, although Mercy "was convinced that providing [these] services . . . would result in significant financial losses."  Dignum Aff. ¶ 4.  This occurred in conjunction with Mercy's meeting with the Southern Ute Indian Tribe ("SUIT") to negotiate an agreement to build a new medical center on SUIT land.  *Id.*  Specifically, "SUIT made it clear that its willingness to work with Mercy was contingent upon Mercy ensuring that members of the tribe who suffer from kidney disease could be treated at the most convenient location possible."  *Id.*  SUIT told Mercy that it wanted a nephrologist consistently available in Durango,[2] but it was not interested in Dr. Bevan's being that nephrologist because "some of the Tribal members did not want Dr. Bevan[] as their physician." Dignum Depo., Ex. A2 to Pl.'s Opp., at 25.  Accordingly, Dr. Bevan was not recruited for the position.  Depo. of Dr. John Boyd, Mercy's Chief Medical Officer, Ex. A4 to Pl.'s Opp., at 26.

After conducting interviews, SUIT decided that it wanted Dr. Mark Saddler, a nephrologist who had formerly practiced with FCNA and who was at that time practicing in Albuquerque, to provide nephrology physician services in Durango.  Dignum Aff. ¶ 5; Saddler Aff. ¶¶ 3, 10.  Dr. Saddler was not willing to open a nephrology practice in Durango because of the financial risk; however, he was willing to come to Durango as an employed physician.  Saddler Aff. ¶ 10.  Mercy agreed to employ Dr. Saddler, who began working at Mercy in January 2005.  *Id.*; Dignum Aff. ¶ 5.

As both Mercy and SUIT anticipated that a nephrology practice would lose money, they entered into an agreement regarding how those losses would be covered.  Dignum Aff. ¶ 6.  Mercy

---

[2] SUIT's members account for over 30% of the Durango-area dialysis patients.  Saddler Aff. ¶ 9.

agreed to sustain losses of up to $500,000 over seven years, and SUIT agreed to cover the losses beyond that amount. *Id.*

In addition to bringing in a nephrologist, SUIT also interviewed representatives of several dialysis companies regarding the provision of dialysis services in Durango. *Id.* ¶ 5. SUIT selected DaVita to develop in Durango an outpatient dialysis clinic which was named the Durango Dialysis Center ("DD Center"). DaVita contracted with Dr. Saddler to be the Medical Director of the DD Center. *Id.*; Saddler Aff. ¶ 11. Dr. Saddler also has a 5% ownership interest in the DD Center. Saddler Aff. ¶ 11. Mercy has no ownership or financial interest in the DD Center. Dignum Aff. ¶ 5. DaVita also agreed to staff and operate a small inpatient dialysis unit at Mercy to allow patients to receive dialysis while hospitalized, and Mercy pays DaVita for each dialysis performed in the unit. Boyd Aff., Ex. 4 to Def.'s S.J. Br., ¶ 6. Mercy was not involved in the discussions between SUIT and DaVita regarding the arrangements for DD Center or DaVita's selection of Dr. Saddler as Medical Director of the DD Center. *Id.* ¶¶ 6–7. Dr. Bevan and his FCNA associates maintain privileges at DD Center in Durango.

**C.    Dr. Bevan's Staff Privileges at Mercy and Mercy's Exclusive Contract with Dr. Saddler**

From 1983 to 2005, Dr. Bevan held consulting staff privileges at Mercy, which were renewed every two years. Bevan Aff. ¶ 8. The consulting staff at Mercy "consists of providers who offer services required or desired but not otherwise provided by an Active Medical Staff member." Mercy Medical Staff Bylaws, Ex. A27 to Pl.s' Opp., ¶ 2.1.2, at 13–14. Physicians with consulting staff privileges are required to accept consultation assignments, may utilize the hospital as appropriate to their practice, and may admit and manage patients and exercise approved clinical privileges. *Id.* ¶¶ 2.1.1 & 2.1.2. Over the ten years prior to 2005, Dr. Bevan had not been

6

physically present at Mercy to do a formal consult or treat a patient, because the vast majority of nephrology patient care takes place at inpatient and outpatient dialysis centers. Bevan Depo. at 50, 59. However, Dr. Bevan and his associates were available at any time for phone consults, and Dr. Bevan was "sometimes . . . up all night on the phone with people" about their patients. *Id.* at 58.

When Dr. Saddler began working at Mercy in January 2005, Mercy informed Dr. Bevan that under the Bylaws he was no longer eligible for consulting staff privileges because Mercy now had a nephrologist on the active medical staff. Boyd Depo. at 126–27; Boyd Letter, Ex. A11 to Pl.s' Opp.; Bylaws ¶ 2.1.2. Mercy advised Dr. Bevan that he would be eligible to apply for courtesy staff privileges, but those privileges would not permit him to admit or treat patients at the hospital. Boyd Depo. at 48–49; Ex. A11 to Pl.s' Opp.; Dignum Letter, Ex. A13 to Pl.s' Opp.; Bylaws ¶ 2.1.3. Mercy also told Dr. Bevan that it was allowing additional nephrologists to apply for staff privileges at Mercy pursuant to its Bylaws. Ex. A13 to Pl.'s Opp.

According to those Bylaws, active privileges and consulting privileges have similar requirements, but active staff members are also required to participate in emergency room call coverage and must "meet[] the residency requirement and resid[e] near enough to the Hospital to provide continuous care to their patients . . . ." Bylaws ¶ 2.1.1. Mercy advised Dr. Bevan of two specific requirements for active privileges with which Dr. Bevan at that point did not comply: (1) as an active staff member, Dr. Bevan had to reside "near enough to the Hospital to provide continuous care to [his] patients," and the Bylaws defined "residency" as "the act of residing in the appropriate county (in this case La Plata County, Colorado) during the initial twelve (12) month provisional status period, at the end of which time the provider shall reside not less than ten (10) months a year

permanently in that county"; and (2) although Dr. Bevan was board certified in Internal Medicine, he would have to become recertified in Nephrology as well.[3] Boyd Letter, Ex. A16 to Pl.'s Opp.

On March 8, 2005, Dr. Bevan formally requested active staff privileges at Mercy. Ex. A15 to Pl.'s Opp. Over the next two months, several letters were exchanged between Mercy and Dr. Bevan regarding his compliance with the board certification and residency requirements. *See* Bevan Depo. Exs. 26–29, 33. In addition, Dr. Neil Collinge, one of Dr. Bevan's associates at FCNA, applied for active staff privileges at Mercy on May 10, 2005. Bevan Depo. Ex. 35. When Drs. Bevan and Collinge applied for active privileges, "Mercy had to decide for the first time whether it wanted to have open staffing for its nephrology services or enter into an exclusive contract with one practice." Def.'s Reply at 13.

When Dr. Saddler learned that Dr. Bevan was seeking staff privileges for himself and his FCNA associates, he told Mercy administration that he "was willing to compete with Dr. Bevan in terms of patient care and patient interactions." Saddler Aff. ¶ 12. However, Dr. Saddler expressed concern to Mercy administration that Dr. Bevan "might be trying . . . to ensure that a practice in Durango would fail in order to protect his position in the Four Corners market." *Id.*

On May 12, 2005, Mercy informed both Dr. Bevan and Dr. Collinge that, although their privileges requests would be placed on the credentialing committee's June agenda, the hospital's board of directors was "scheduled to meet on May 26, 2005, to consider a Medical Staff Development Plan (MSDP) which may limit the number of physicians allowed to apply for or transition to the Active Medical Staff in specific medical and surgical specialties based on the needs of the community and the hospital." Bevan Depo. Ex. 36. On June 2, 2005, Mercy informed Dr.

---

[3] Dr. Bevan's certification in Internal Medicine was sufficient for renewal of his privileges in 2002 and 2004. Bevan Aff. ¶ 17.

Bevan and Dr. Collinge that it was considering entering into an exclusive contract with Dr. Saddler for the provision of nephrology services. Bevan Depo. Ex. 37.

In June 2005, Mercy proceeded to enter into an exclusive employment contract with Durango Nephrology Associates ("DNA"), Dr. Saddler's nephrology practice, for the provision of nephrology physician services at Mercy. Mercy informed Dr. Bevan and his associates that they would "not be able to exercise any clinical privileges" at Mercy unless done so "under the provisions of that exclusive contract," and that they should contact Dr. Saddler regarding the possibility of providing such services. Bevan Depo. Exs. 38, 39. Dr. Bevan contacted Dr. Saddler in July 2005 regarding the possibility of his using any FCNA associates to provide nephrology services at Mercy. Bevan Depo. Ex. 47. At that time, Dr. Saddler "was already engaged in arrangements to bring a partner into [his] practice" and "was not interested in having Dr. Bevan or his associates" as partners. Saddler Aff. ¶ 13. Dr. Saddler thus responded to Dr. Bevan's inquiry that no additional coverage at Mercy was needed. Bevan Depo. Ex. 48. Dr. Saddler then brought Dr. Elizabeth Helms into DNA as his partner. Saddler Aff. ¶ 13.

According to Mercy, the decision to contract exclusively with DNA was based partly on Mercy's conclusion that an exclusive practice "would enhance the uniformity, quality of care, and ready availability of services" at Mercy, and partly on Mercy's "concern that the granting of Active Staff membership to FCNA physicians could reduce DNA patient volumes to the point where DNA physicians could lose technical proficiency and/or become underemployed and dissatisfied with their jobs and leave the community." Boyd Aff. ¶ 10. Dr. Bevan, however, testified that Dr. Boyd, Mercy's Chief of Staff, and another doctor on staff all told Dr. Bevan that Mercy was concerned Dr. Bevan would compromise Dr. Saddler's practice if granted privileges and that Mercy wanted all

the business to go to its own doctors.  Bevan Depo., Ex. A5 to Pl.s' Opp., at 106–09.  Thus, Plaintiffs contend Mercy's sole motivation in entering into the exclusive contract was "to exclude Dr. Bevan" because it "was concerned about the economic impact on [Mercy's] nephrology physician practice if Dr. Bevan was able to provide those services in Durango and it wanted to protect its practice."  Pl.s' Opp. at 10.

### D.      Activity Since Exclusive Contract Executed

In light of Mercy's exclusive contract with Dr. Saddler's practice, DNA, other doctors cannot provide inpatient nephrology physician services in Durango.  FCNA maintains an office in Durango, and Dr. Bevan and his associates have privileges at DD Center, the outpatient dialysis clinic in Durango.  Saddler Aff. ¶ 14.  Dr. Bevan's nephrology patient base from the Durango area has dropped steadily, from an average of 29 per month during the period from October 2004 through March 2005, to nine patients in February 2006.  McCarthy Exp. Rpt., Ex. 15 to Def.'s S.J. Br., at 18 & Appendix.  The number of dialysis patients from the same area dropped from an average of 20 patients per month during the October 2004 to March 2005 time period, to one patient in February 2006.  *Id.* at 18–19 & Appendix.  According to Plaintiffs' expert, these numbers demonstrate that having inpatient privileges is essential for a nephrologist to be able to compete successfully in the Durango nephrology physician services market.  *Id.*  As of December 2006, Dr. Bevan treated approximately 16% of the patients who received dialysis at the DD Center, and DNA physicians treated approximately 20% of those patients.  Saddler Aff. ¶ 14.

Since opening in January 2005, Mercy's nephrology practice patient volumes increased approximately 15% per month throughout 2005 and continued to increase at a lower rate in 2006. Tramontana Depo., Ex. A26 to Pl.'s Opp., at 42.  Although Mercy has a goal to make DNA a

profitable practice, as of September 2006 the practice had incurred losses of $537,790, with Mercy covering approximately $125,000 of that amount and SUIT covering the remainder. Tramontana Depo. at 61–62; Tramontana Aff. ¶ 3. Dr. Bevan concedes that, to date, Mercy has not raised its prices for nephrology services. Pl.s' Opp. at 14. Dr. Bevan also concedes that approximately 70% of Mercy's charges for nephrology services are to government payers that pay on a fixed fee schedule over which Mercy has no control. *See* Pl.s' Opp. at 15; McCarthy Exp. Rebuttal Rpt., Ex. A30 to Pl.s' Opp., at 10. The vast majority of the remainder of Mercy's charges are to non-governmental, commercial payers, while 1.6% of the revenue from nephrology services comes from self-pay patients. Aff. of William Willson, Mercy Consultant, Ex. 13 to Def.'s S.J. Br., ¶¶ 8, 10.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate under F.R.Civ.P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When applying this standard, a court reviews the pleadings and the documentary evidence in the light most favorable to the nonmoving party. *See Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988). To defeat a properly supported motion for summary judgment, "there must be evidence on which the jury could reasonably find" for the nonmoving party. *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In addition, "'where the non moving party will bear the burden of proof at trial on a dispositive issue' that party must 'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in

order to survive summary judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 322).

## III.    ANALYSIS OF PLAINTIFFS' ANTITRUST CLAIMS

Plaintiffs filed suit against Mercy on October 20, 2005, approximately seven months after Mercy entered into the exclusive contract with DNA, Dr. Saddler's practice. Plaintiffs' antitrust causes of action stem from two central allegations. First, Plaintiffs contend that the impact of Mercy's decision to enter into the exclusive contract "will allow [Mercy] to monopolize nephrology physician services in the area, reduce patient choice, eliminate competition and result in above-competitive level prices for health plans and consumers." Sec. Am. Compl. ¶ 1. Second, Plaintiffs contend Mercy "combined and conspired" with DaVita, Dr. Saddler, and SUIT to exclude Dr. Bevan and FCNA from obtaining privileges at Mercy and participating the development and management of the DD Center. *Id.* ¶ 2.

Mercy contends that all of Plaintiffs' antitrust claims should be dismissed because Plaintiffs have no standing to pursue them. Mercy also argues that, even if Plaintiffs do have standing, the undisputed facts establish that Mercy has not violated §§ 1 and 2 of the Sherman Act or the corresponding Colorado antitrust statutes.[4]

### A.    Standing to Pursue *Per Se* Illegal Tying Arrangement Claims (Counts VI and VII)

Antitrust standing "is distinct from [the concept] of constitutional standing." *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1267 (10th Cir. 2006). Determining a plaintiff's

---

[4] In their briefing, the parties apply federal antitrust law to both the federal and state antitrust claims. The Court agrees that federal cases interpreting the Sherman Act provide guidance for analysis of claims brought under the Colorado Antitrust Act and will therefore evaluate both the federal and state antitrust claims under federal law. *Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.*, 311 F. Supp. 2d 1048, 1074 n.4 (D. Colo. 2004) (because "Colorado antitrust law mirrors federal antitrust law under the Sherman Act," federal law was applied to state law antitrust claims).

antitrust standing has been described as "a search for the proper plaintiff to enforce the antitrust laws." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991). It requires an evaluation of "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983). The two-pronged approach that has developed provides that, to establish antitrust standing, a plaintiff must have suffered an "antitrust injury" and must be "an efficient enforcer of the antitrust laws." *Abraham*, 461 F.3d at 1267–68; *Todorov*, 921 F.2d at 1449. Defendant argues plaintiffs can satisfy neither requirement and thus are barred from bringing their antitrust claims.

## *Antitrust Injury*

A plaintiff has the burden to prove that the plaintiff has suffered an antitrust injury, which is the "threshold inquiry" in analyzing standing. *Abraham*, 461 F.3d at 1267. An antitrust injury is an "injury of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 667 (10th Cir. 2006) (quotations omitted). The Supreme Court has clarified that "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations . . . would be likely to cause." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (quotation omitted) (alteration in original). In other words, the plaintiff's injury should "coincide[] with the public detriment tending to result from the alleged violation" such that "public and private enforcement of the antitrust laws will further the same goal of increased competition." *Todorov*, 921 F.2d at 1450 (quotation omitted). Such a requirement furthers the purpose of the antitrust laws,

which "were enacted 'for the protection of *competition*[,] not *competitors*.'" *Brunswick*, 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

Mercy first generally contends that it is "clearly established" that exclusive contracts between hospitals and physicians do not violate antitrust laws and do not result in antitrust injuries. Def.'s S.J. Br. at 21–22. However, that the majority of plaintiffs who assert such claims are unsuccessful does not mean that they *cannot* be successful depending on the facts presented. There are at least some cases in which courts have held that plaintiffs challenging hospital staffing decisions under the antitrust laws had standing to pursue their claims and that the claims at least survived motions to dismiss or motions for summary judgment. *E.g.*, *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 274–75 (3d Cir. 1999); *Fuentes v. S. Hills Cardiology*, 946 F.2d 196, 201–02 (3d Cir. 1991) (holding, without addressing standing, that plaintiff who was denied staff privileges at hospital stated a claim for violation of § 1 of Sherman Act); *Bolt v. Halifax Hosp. Med. Ctr.*, 891 F.2d 810, 816 n.8 (11th Cir. 1990), *overruled in part on other grounds by City of Columbia v. Omni Outdoor Adver.*, 499 U.S. 365 (1991); *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440 (9th Cir. 1988). Thus, Mercy's categorical assertion that Plaintiffs generally do not have standing to pursue antitrust claims based on a hospital's exclusive contract with another provider is insufficient to demonstrate that Plaintiffs do not have standing under the facts of this case.

Mercy next contends that Plaintiffs' injuries have resulted from an *increase* in competition in the provision of physician nephrology services in the Four Corners area rather than from a *restraint* on competition, and thus do not constitute injuries of the type the antitrust laws were intended to prevent. Specifically, Mercy contends:

> Mercy has increased the availability of nephrology physician services in the Four Corners area. Not only has Mercy helped bring two nephrologists to Durango,

14

but also, with the presence of a nephrologist, inpatient dialysis capabilities came to Durango. Because of Mercy, dialysis patients in the Four Corners area now have the option of staying in Durango to receive care and treatment that they would have been required to go to Denver or Farmington to receive. . . . Absolutely nothing that Mercy has done has precluded Bevan's patients from receiving precisely the care and treatment they received from him before Mercy began providing nephrology physician services.

Def.'s S.J. Br. at 22–23. Plaintiffs, on the other hand, contend that Mercy has "reduced and eliminated competition" for nephrology physician services in the Durango area and has thereby "eliminated patient choice." Pl.s' Opp. at 22.

The success of Mercy's argument depends on the definition of the "relevant geographic market" in this case. The determination of a relevant market, which consists of both a product market and a geographic market, "is a necessary predicate to the finding of an antitrust violation." *F.T.C. v. Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir. 1999); *see Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 756 (10th Cir. 1999). Thus, the contours of the relevant market are important to the standing analysis because whether a plaintiff's injury is the result of an unlawful restraint on competition "can only be assessed in the context of a relevant market." Pl.s' Opp. at 24 n.6. The parties agree that the relevant product market is the provision of nephrology physician services. Def.'s S.J. Br. at 22; Pl.'s Opp. at 22. However, they disagree as to the contours of the relevant geographic market.

Mercy argues that the relevant geographic market is the entire Four Corners area, but at the very least includes Farmington. Def.'s S.J. Br. at 26–27. Plaintiffs, on the other hand, assert that the relevant geographic market is more limited to the "Durango area," which according to Plaintiffs' expert includes most of La Plata County, all of Archuleta County, and a large portion of Montezuma County, but does not include Farmington. Pl.s' Opp. at 26; McCarthy Exp. Rpt. at 5,

17.   Plaintiffs cannot and do not contend that Mercy's exclusive contract with DNA has restrained competition in an area that includes Farmington given that the entry of DNA into the market has resulted in an increase in the number of nephrology practices in the area and that FCNA undisputedly remains the strongest competitor in that market.   Thus, for Plaintiffs' antitrust claims to have a chance of surviving summary judgment, there must be a genuine issue of material fact as to whether the relevant geographic market is the Durango area rather than a larger area that includes Farmington.

The relevant geographic market encompasses "the area in which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *Tenet Health Care Corp.*, 186 F.3d at 1052.   Determination of the proper market "is highly fact sensitive" and "can be determined only after a factual inquiry into the commercial realities faced by consumers."   *Id.*   The Supreme Court has noted that "convenience of location is essential to effective competition" in most service industries.   *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 358 (1963).   The Tenth Circuit has also described the relevant geographic market as "the narrowest market which is wide enough so that products from adjacent areas cannot compete on substantial parity with those included in the market."   *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1026–27 (10th Cir. 2002) (quotations omitted); *see also Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836, 840 (5th Cir. 2002) (geographic market includes area "where consumers could turn for alternative products or sources of the product if a competitor raises prices") (quotation omitted).   To ascertain this area, "evidence of current market behavior must be viewed in a 'dynamic' framework that considers the possible competitive

responses of firms outside the current market area to anticompetitive behavior of firms within." *Parikh v. Franklin Med. Ctr.*, 940 F. Supp. 395, 403 (D. Mass. 1996) (quotation omitted).

Mercy contends that the undisputed facts unequivocally demonstrate that the relevant geographic market includes Farmington. First, it is undisputed that "physicians and patients [in the Four Corners area] routinely cross state borders to provide and seek medical treatment, respectively." Sec. Am. Compl. ¶ 9. Dr. Bevan also testified in his deposition that people in the Four Corners area "are used to driving large distances to do dialysis," and two dialysis patients testified that it was not an inconvenience to travel to Farmington for medical treatment. Bevan Depo. at 116; Depo. of Francis Garcia, Ex. 21 to Def.'s S.J. Br., at 17; Depo. of Martha Phillips, Ex. 24 to Def.'s S.J. Br., at 12–13. In addition, Mercy emphasizes the evidence that Durango residents have in the past and still do travel to Farmington to obtain nephrology physician services. Bevan Depo. at 60; Phillips Depo. at 12–13; Garcia Depo. at 11–12. Mercy argues that, because Durango consumers *actually* go to Farmington for such services, this conclusively establishes that they can *practicably* do so regardless of whether Mercy's services are more convenient. Def.'s Reply at 29. Finally, DNA and FCNA advertise in both Durango and Farmington, Bevan Depo. Exs. 3 & 4, which Mercy maintains is "[c]onsistent with the competition between health care providers in Farmington and . . . Durango." Def.'s S.J. Br. at 29.

Plaintiffs, on the other hand, stress that determination of the relevant geographic market is a fact question for the jury. Plaintiffs point to the report of their economic expert, who analyzed patient data over several time periods to conclude that the relevant geographic market is southwestern Colorado, including most of La Plata County, all of Archuleta County, and a large portion of Montezuma County. *See generally* McCarthy Exp. Rpt. This market, McCarthy

concluded, comports with the parameters of the Durango nephrologists' primary service area ("PSA"), which is defined as the smallest set of zip codes from which a provider draws 90% of its patients. *Id.* at 5 & n.7. The three tests employed by plaintiffs' expert analyzed: (1) the "overlap" between the PSAs of the Durango and Farmington nephrologists, *id.* at 11–13; (2) the percentage of patients leaving and entering the PSAs for treatment, *id.* at 13–15; and (3) the effect of a "hypothetical monopolist" in a given area, *i.e.*, whether a hypothetical price increase by physicians in the area would cause enough patients to go elsewhere for services that the increase would be unprofitable. *Id.* at 15–17. McCarthy also noted the possibility that Durango patients who were treated in Farmington on an inpatient basis in early 2006 may have been receiving emergency treatment or services not available in Durango. *Id.* at 13.

The Court has determined that additional argument on the issue of the relevant geographic market is necessary before rendering a decision on Defendant's Motion for Summary Judgment as it relates to Plaintiffs' cause of action based on an alleged illegal tying arrangement in violation of § 1 of the Sherman Act and the Colorado Antitrust Act.

### B. Unlawful Monopoly and Attempt to Monopolize under § 2 of the Sherman Act and the Colorado Antitrust Act (Counts I, II and III)[5]

A monopolization claim under § 2 of the Sherman Act requires a showing of (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 973 (10th Cir.

---

[5] Although a plaintiff must also have antitrust standing to pursue monopolization or attempted monopolization claims, the Court believes that the validity of Plaintiffs' claims of this nature can be determined without first deciding the issue of standing.

1990). In arguing that it is entitled to summary judgment on this claim, Mercy focuses solely on the first element, arguing that there is no proof of monopoly power.

Proof of monopoly power "requires a showing of both power to control prices and power to exclude competition" in the relevant product and geographic markets. *Tarabishi v. McAlester Reg'l Hosp.*, 951 F.2d 1558, 1567 (10th Cir. 1991) (citations omitted). Again, the parties agree that the relevant product market is nephrology physician services. In analyzing Plaintiffs' monopolization and attempted monopolization claims, the Court will assume that the relevant geographic market is limited to the Durango area as advocated by Plaintiffs. With that assumption, there is a fact issue as to Mercy's power to exclude competition because Plaintiffs have presented at least some evidence that maintaining staff privileges at Mercy, which is the only hospital in Durango, is essential to the ability to compete in the nephrology physician services market in that area.

Plaintiffs contend this same evidence demonstrates Mercy's power to control prices for nephrology physician services in the Durango area. Plaintiffs' expert states in his report that "[a]lthough my analysis of the available physician pricing data indicates that Mercy is currently not exercising [its] market power . . . , it could potentially exercise this market power in the future since it has erected a barrier to entry by entering into an exclusive contract with Dr. Saddler." McCarthy Exp. Rpt. at 19. Mercy argues that the arrangements by which government and other commercial payers pay Mercy for the provision of nephrology physician services foreclose Mercy from raising prices above competitive levels.

Plaintiffs do not dispute that approximately 70% of the payments for Mercy's nephrology physician services "come from government payers which pay on a fixed fee schedule established by the state or federal government, over which providers have no control." Willson Aff. ¶ 7. Of the

remaining revenue for these services, less than 1.6% comes from self pay patients, while the rest (approximately 30%) comes from non-governmental, commercial payers. *Id.* ¶ 8. It is Mercy's arrangement with these commercial payers that underlies the parties' dispute about whether Mercy has monopoly power to control prices in the relevant market. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 28 n.47 (1984), *abrogated on other grounds by Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (noting that "[i]nsurance companies are the principal source of price restraint in the hospital industry" and "place some limitations on the ability of hospitals to exploit their market power").

The payments from some of the commercial payers are capped at the amount determined by the payer to be the "usual, customary, and reasonable" ("UCR") fee schedule for such services in the region, as determined by regional studies. Willson Aff. ¶ 6 & Ex. thereto. William Willson, a health care consultant who negotiates with commercial payers on Mercy's behalf, testified that insurers set UCR rates on a region-wide basis and do so independently and without input from the providers. Willson Depo., Ex. 1 to Def.'s Supp. Reply, at 51. He also testified that it would be a "nonsensical scenario" for Mercy to inform an insurer that UCR rates should be increased and that he did not recall a provider ever having done so. *Id.* at 52. While Mercy certainly *could* make such a suggestion to an insurer, *id.* at 52–53, there is no evidentiary support for any assertion by Plaintiffs that Mercy had any particular ability to force these insurers actually to raise the UCR rates at all, let alone to super-competitive levels.

The remainder of the commercial payers pay on fixed-fee schedules established by contracts between Mercy and each individual insurer. *See* Ex. to Willson Aff. When these contracts are up for renewal, Mercy can attempt to negotiate increases in the fee schedules and can threaten to

terminate the contract as part of those negotiations.  Willson Depo. at 48, 57.  As noted above,

Mercy thus far has neither requested nor obtained fee increases specifically for nephrology

physician services.  *Id.* at 61.  Moreover, Mr. Willson testified that Mercy has "no practical way to

do so" and that "[t]he payments to Mercy for physician nephrology services are such a small

percentage of the total that they are never negotiated separately from the rates generally paid for

physician services."  Willson Aff. ¶¶ 9–10.  In explaining these statements, Mr. Willson testified as

follows:

> Q      Okay.  And then you said – and the sentence reads: "It [Mercy] has
> no plans to do so and no practical way to do so."
>
> A      Uh-huh.
>
> Q      What did you mean by the second part of that sentence, "... and no
> practical way to do so"?
>
> A      Two parts to that.  No. 1 is: Again, back to the math, we're talking
> about two-tenths-of-one-percent of Mercy's revenue stream, roughly estimated.  So,
> that's part of the practical explanation.  It doesn't make sense to put a lot of effort
> into something that's essentially immaterial.
>
> And, No. 2, it's extremely difficult to convince an insurance company
> to change their computer system, the way they do business in order to selectively
> pay nephrology physicians differently than other Mercy physicians.  It's a very
> cumbersome, difficult, expensive system change for most insurers.

Willson Depo. at 62.

In light of this evidence, the Court holds that Plaintiffs have failed to create a fact issue as to

Mercy's ability to control prices in the relevant market.  Mercy has no control over price with

respect to the government payers, and there is simply no indication, even assuming Mercy has a

dominant market share for nephrology physician services in the Durango area, that Mercy has any

particular leverage with the commercial insurers as a result of its position.  Mr. Willson was asked

extensively in his deposition about whether Mercy had the "right" to negotiate for contractual fee increases or to request UCR rate increases, but such questions are immaterial to whether Mercy's market power would force these insurers to accept such increases. Indeed, the evidence presented shows that Mercy (1) has no more control than any other provider in the country with respect to UCR rates, and (2) has no practical ability to force commercial insurers to pay super-competitive fees for nephrology physician services. Without evidence of such control or ability, a jury could not find that Mercy has monopoly power in the relevant market.

The same reasoning forecloses Plaintiffs' claim for attempted monopolization. One of the elements of this claim is a "dangerous probability of success in monopolizing the relevant market," *i.e.*, a dangerous "probability of attaining the power to control prices in the market and the power to exclude competition from the market." *Shoppin' Bag of Pueblo, Inc. v. Dillon Cos.*, 783 F.2d 159, 161–62 (10th Cir. 1986). The evidence, which conclusively demonstrates that Mercy does *not* have the power to control prices for nephrology physician services in the Durango area, also shows there is no dangerous probability of Mercy's achieving such power. Accordingly, Mercy is entitled to summary judgment on Plaintiffs' monopolization and attempted monopolization claims under § 2 of the Sherman Act and the Colorado Antitrust Act.

### C. Conspiracy to Restrain Trade under § 1 of the Sherman Act and the Colorado Antitrust Act (Counts IV and V)

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1. To prevail on a conspiracy claim under § 1, a plaintiff must establish (1) concerted action in the form of a contract, combination, or conspiracy, and (2) an

unreasonable restraint of trade. *Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1139 (10th

Cir. 1997). The Tenth Circuit has summarized the "concerted action" requirement as follows:

> A conspiracy involves two or more entities that previously pursued their own
> interests separately combining to act as one for their common benefit. When two
> formerly separate entities combine for their common benefit, their activity is fraught
> with anti-competitive risk because it deprives the marketplace of the independent
> centers of decisionmaking that competition assumes and demands. On the other
> hand, unilateral conduct, regardless of its anti-competitive effects, is not prohibited
> by § 1 of the Sherman Act. It is therefore critical to distinguish between unilateral
> and concerted action in proving a violation of § 1.

*Abraham*, 461 F.3d at 1256 (internal citations, quotation marks, and ellipsis omitted).

Where a plaintiff relies on circumstantial evidence to prove concerted action, the plaintiff

"must present 'evidence that tends to exclude the possibility that the alleged conspirators acted

independently.'" *Id.* at 1257 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 588 (1986) (internal quotation omitted)). "That is, the antitrust plaintiff must present evidence

that the alleged conspirators 'had a conscious commitment to a common scheme designed to

achieve an unlawful objective.'" *Id.* (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S.

752, 764 (1984)).

Plaintiffs allege in their complaint that (1) Mercy, Dr. Saddler, and SUIT entered into an

agreement pursuant to which Mercy agreed to hire Dr. Saddler and, at the same time, not to allow

Dr. Bevan to provide nephrology services at Mercy, and (2) Mercy, Dr. Saddler, DaVita, and SUIT

entered into an agreement to exclude Dr. Bevan from the development, management, and

ownership of the DD Center. Sec. Am. Compl. ¶¶ 100–01. However, the decision to hire Dr.

Saddler at Mercy, without the existence of the exclusive contract, cannot be characterized as anti-

competitive. In addition, the fact that Dr. Saddler rather than Dr. Bevan was offered an ownership

interest in the DD Center is immaterial to the antitrust analysis, as Dr. Bevan continues to maintain

privileges and treat patients there. Rather, the anti-competitive conduct on which Plaintiffs' complaint is based is Mercy's exclusive contract with Dr. Saddler. Thus, the crux of Plaintiffs' § 1 claim is that Mercy conspired with others to exclude providers of nephrology services, except those in Dr. Saddler's practice, from maintaining privileges at Mercy, and Plaintiffs must produce evidence of such a conspiracy to potentially survive summary judgment.

Plaintiffs present a good deal of evidence, and Mercy does not dispute, that Mercy cooperated with SUIT in recruiting Dr. Saddler to come to Durango. Mercy acknowledges it was informed by SUIT representatives that SUIT wanted Mercy to hire Dr. Saddler and that SUIT was not interested in bringing Dr. Bevan to Durango to provide physician services; accordingly, Mercy did not recruit Dr. Bevan for the position. Def.'s Reply at 40; Boyd Depo. at 24–26; Tramontana Depo. at 12–13; Dignum Depo. at 24–25. In addition, DaVita informed Mercy representatives that DaVita was discussing with Dr. Saddler the possibility of his becoming the medical director of the dialysis clinic. Tramontana Depo. at 15–16, 31–32. Plaintiffs also assert, and again Mercy does not dispute, that Mercy, SUIT, and DaVita were engaged in a collaborative relationship involving the outpatient dialysis center, the hospital practice, and Dr. Saddler's office practice.

None of this evidence, however, tends to prove the existence of any concerted action with respect to Mercy's decision to contract *exclusively* with Dr. Saddler and thus to preclude Dr. Bevan from obtaining staff privileges at Mercy. The "collaborative relationship" among Mercy, SUIT, and DaVita and the above-described conversations involving representatives of those entities occurred in the context of Mercy's initially hiring Dr. Saddler and opening the DD Center with Dr. Saddler as medical director. There is no indication that the conversations related to the subsequently executed exclusive contract between Mercy and DNA. Moreover, Mercy's chief

medical officer testified that "[n]o one from Mercy ever communicated with anyone associated with [SUIT] or with DaVita about Mercy's actions regarding Dr. Bevan's or his associates' medical staff membership category and clinical privileges or regarding the exclusive contract with Dr. Saddler's practice." Boyd Aff. ¶ 10. Plaintiffs have presented no evidence controverting that statement and thus have failed to provide direct evidence that Mercy did not act independently in deciding to enter into an exclusive contract with Dr. Saddler.

Plaintiffs' contention that circumstantial evidence supports the existence of a conspiracy fares no better. Plaintiffs assert that "Mercy acted contrary to its economic self-interest because of the conspiracy" and contend that, by employing Dr. Saddler and Dr. Helms rather than granting active staff privileges to Dr. Bevan, Mercy ignored a "high quality and no-cost solution" to the issue of increasing the availability of physician services and hospital coverage. Pl.'s Resp. at 45. In so arguing, however, Plaintiffs conflate Mercy's decision to employ Drs. Saddler and Helms (rather than simply to grant them staff privileges) on the one hand and its decision to contract exclusively with Dr. Saddler's practice on the other. Plaintiffs do not assert that granting the exclusive contract, which again is the alleged anti-competitive conduct, was in and of itself contrary to Mercy's economic self-interest. Moreover, even if Mercy acted against its economic interest by entering into the exclusive contract, there is no evidence that it was against the economic interests of any of the other parties to the alleged conspiracy—DaVita, SUIT, or Dr. Saddler. Thus, the evidence cited by Plaintiffs does not "tend[] to exclude the possibility that the alleged conspirators acted independently," thus foreclosing Plaintiffs' conspiracy claim. *Abraham*, 461 F.3d at 1257.

The Court concludes that Plaintiffs' conspiracy claim under § 1 of the Sherman Act fails as a matter of law. In addition, the Court notes that Plaintiffs do not argue that application of the

Colorado Antitrust Act of 1992 would lead to a different result.  Accordingly, Defendant is entitled

to summary judgment on Plaintiffs' federal and state conspiracy antitrust claims.

## IV.     ANALYSIS OF PLAINTIFFS' NON-ANTITRUST STATE LAW CLAIMS[6]

### A.     Violation of Colorado Consumer Protection Act (Count VIII)

To prove a cause of action under the Colorado Consumer Protection Act ("CCPA"), C.R.S.

§ 6-1-105(1)(n)(III), a plaintiff must show that: (1) the defendant engaged in an unfair or deceptive

trade practice; (2) the challenged practice occurred in the course of defendant's business, vocation,

or occupation; (3) it significantly impacts the public as actual or potential consumers of the

defendant's goods, services, or property; (4) the plaintiff suffered injury in fact to a legally

protected interest; and (5) the challenged practice caused the plaintiff's injury.  *Rhino Linings USA,*

*Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146–47 (Colo. 2003) (citation omitted).  As

is relevant to this case, a defendant engages in a deceptive trade practice under the first element of

the CCPA when, in the course of the defendant's business, vocation, or occupation, the defendant:

> (n) Employs "bait and switch" advertising, which is advertising accompanied by an
> effort to sell goods, services, or property other than those advertised or on terms
> other than those advertised and which is also accompanied by one or more of the
> following practices: . . . (III) Requiring tie-in sales or other undisclosed conditions to
> be met prior to selling the advertised goods, property, or services.

C.R.S. § 6-1-105(1)(n)(III).

Plaintiffs contend Mercy violated the CCPA by advertising its hospital services to the

general public without disclosing that patients are required to purchase nephrology physician

services only from its employed physicians, Drs. Saddler and Helms.  Plaintiffs argue this is an

---

[6] There is no dispute that Colorado law applies to Plaintiffs' state law claims.

omission of a material fact by Mercy in its advertising, which makes that advertising inaccurate, misleading, and deceptive.  Pl.s' Opp. at 50.

To the contrary, the Court finds that Mercy has not engaged in a deceptive trade practice. Plaintiffs do not assert that Mercy affirmatively and falsely advertised that patients at Mercy may be treated by nephrologists other than Dr. Saddler or Dr. Helms.  Physicians must maintain privileges at a hospital in order to treat patients there regardless of whether the hospital has entered into an exclusive contract with a provider.  Thus, if Mercy's advertising constitutes a deceptive trade practice, so would the advertising by any hospital that does not affirmatively disclose the identities of every doctor who has privileges there so that patients may evaluate whether they want to be treated by those physicians.  Such a requirement would be both unreasonable and untenable. Accordingly, Mercy's failure to disclose in its advertising the fact that only Dr. Saddler and Dr. Helms can provide nephrology physician services to patients hospitalized at Mercy does not constitute "bait and switch" advertising and is not a deceptive trade practice.

In addition, Plaintiffs have presented no evidence under the fourth element of their CCPA claim that the alleged deceptive trade practice significantly impacts the public.  As argued by Mercy, Plaintiffs have "presented no evidence whatsoever of any patient who was admitted to Mercy . . . believing that Bevan would be able to provide inpatient hospital services at Mercy and relying on that belief in selecting Mercy as the place of hospitalization."  Def.'s Reply at 50–51. With no evidence of how many patients or potential patients have been affected by Mercy's alleged "failure to disclose," there can be no finding of a significant public impact.

### B. Colorado Common Law Civil Conspiracies (Count IX)

To establish a common law civil conspiracy in Colorado, a plaintiff must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as to the proximate result. *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995) (citing *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 502 (Colo. 1989)). Plaintiffs concede that the required proof for a conspiracy under Colorado common law is essentially the same as the proof required for a conspiracy under § 1 of the Sherman Act. Pl.s' Opp. at 51. Thus, for the same reasons Defendant is entitled to summary judgment on Plaintiffs' conspiracy claim under § 1 of the Sherman Act, *see supra* § III(C), Defendant is also entitled to summary judgment on Plaintiffs' common law conspiracy claim.

### C. Tortious Interference with Existing and Prospective Contractual Relations (Count X)

Plaintiffs bring two tortious interference claims based on Defendant's alleged interference with Dr. Bevan's existing and prospective contractual relations with his patients. To prove tortious interference with a contract under Colorado law, a plaintiff must show: (1) a contract existed; (2) the defendant had knowledge of the contract; (3) the defendant interfered and induced the other party to breach the contract; and (4) the plaintiff was injured as a result. *Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.*, 311 F. Supp. 2d 1048, 1115 (D. Colo. 2004) (citing *Westfield Dev. Co. v. Rifle Inv. Assoc.*, 786 P.2d 1112, 1117 (Colo. 1990)). In addition, the interference must be intentional and improper. *Id.* (citing *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 501 (Colo. 1996)). To prove a claim of tortious interference with prospective business relations, a plaintiff must show intentional and improper interference with another's prospective contractual relationship that induces or causes a third party not to enter into or continue the relationship. *Id.* at

1117 (citing *Dolton v. Capitol Fed. Sav. & Loan Ass'n*, 642 P.2d 21, 23 (Colo. App. 1981), and *Wasalco, Inc. v. El Paso County*, 689 P.2d 730, 732 (Colo. App. 1984)). "[A] continuing business or customary relationship, which includes a prospective quasi-contract, suffices to create rights against intentional interference." *Id.* (citing Restatement (Second) of Torts § 766B cmt. c).

Plaintiffs point to no evidence that Dr. Bevan had a contractual relationship with any of his patients. In fact, Dr. Bevan testified that it would have been inappropriate to tell a patient that he or she was required to stay with his care rather than switch to another doctor because "[t]he patient has the final decision on who . . . they wish to choose for their physician care." Bevan Depo. at 75–76. Without evidence of a contract, Plaintiffs' claim for tortious interference with a contract fails as a matter of law.

Interference with another's prospective contractual relations is tortious "only if there is a reasonable likelihood or reasonable probability that a contract would have resulted." *MDM Group Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 886 (Colo. App. 2007) (citing *Klein v. Grynberg*, 44 F.3d 1497 (10th Cir. 1995)). Just as there is no evidence of any existing contracts between Dr. Bevan and his patients, there is no evidence that there is, or ever was, a reasonable likelihood that such contracts would have ever been formed. Dr. Bevan's own testimony indicates that it is inappropriate for doctors and patients to enter into contractual relationships, and no evidence to the contrary has been presented. Accordingly, Defendant is entitled to summary judgment on both of Plaintiffs' tortious interference claims.

### D. Promissory Estoppel (Count XI)

Under Colorado law, a claim of promissory estoppel requires proof that: (1) the promisor made a promise to the promisee; (2) the promisor should reasonably have expected that the promise

would induce action or forbearance by the promisee; (3) the promisee reasonably relied on the promise to the promisee's detriment; and (4) the promise must be enforced to prevent injustice. *Berg v. State Board of Agric.*, 919 P.2d 254, 259 (Colo. 1996). The plaintiff must show there was a "clear and unambiguous promise" on which the plaintiff reasonably and foreseeably relied; a "perceived promise" is insufficient. *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 114 (Colo. App. 1994).

Dr. Bevan asserts that he reasonably relied on the statements of Mercy's President that Mercy was allowing additional nephrologists to apply for active staff privileges and that such statements, which were made after Mercy hired Dr. Saddler but before it entered into the exclusive contract, induced Dr. Bevan to expend effort and funds to meet the requirements for obtaining those privileges. Dr. Bevan contends that, although he proceeded to satisfy all of the requirements in the Bylaws for active staff privileges, his application was denied when Mercy entered into the exclusive contract with Dr. Saddler's practice.

The statement of Mercy's President on which Dr. Bevan asserts he reasonably relied is contained in a letter to Dr. Bevan dated January 28, 2005. Ex. A13 to Pl.s' Opp. The letter states that, at a recent meeting of Mercy's Board of Directors, the Board "elected to allow additional nephrologists to apply for Medical Staff membership and privileges at [Mercy] following current bylaws, policies and procedures. I have, therefore, instructed the staff at the Medical Staff Services Office to send your office the appropriate pre-application materials in response to your earlier request." *Id.* This statement does not constitute a "clear and unambiguous promise" to do anything beyond sending Dr. Bevan the pre-application materials he requested. There is no hint of a promise with respect to whether Dr. Bevan's application would be granted.

The parties dispute whether Dr. Bevan ultimately fulfilled the minimum criteria for obtaining active staff privileges, but even if he did, there is no evidence indicating that Mercy was thereby obligated to grant him such privileges. *See Hutton v. Mem'l Hosp.*, 824 P.2d 61, 62–63 (Colo. App. 1991) (hospital's administrative regulations "contain[ed] no language which requires a hospital to grant staff privileges to every physician who satisfies the minimum criteria set forth in its bylaws . . . . Therefore, the fact that the plaintiff satisfied the minimum criteria for obtaining staff privileges did not obligate the hospital to grant him staff privileges.").

Since there is no evidence that a promise to grant Dr. Bevan active staff privileges was ever made, Plaintiffs' promissory estoppel claim fails as a matter of law.

### E.  Arbitrary, Capricious and Unreasonable Denial of Privileges (Count XII)

Plaintiffs assert a claim for arbitrary, capricious, and unreasonable denial of staff privileges. Plaintiffs cite *Hawkins v. Kinsie*, 540 P.2d 345 (Colo. App. 1975), in support of their argument that such a cause of action exists in Colorado. In *Hawkins*, the Colorado Court of Appeals held that "a physician whose staff privileges are not renewed by the governing board of a private hospital . . . states a claim for relief in damages by alleging that the decision not to renew those privileges was arbitrary, capricious, and unreasonable." *Id.* at 349. The Court has found no Colorado Supreme Court opinions addressing this cause of action.

A federal court applying state law should follow an applicable decision of the intermediate appellate court of the state "absent convincing evidence that the highest court of the state would decide otherwise." *MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257, 1262 (10th Cir. 2006) (quotation omitted). The Court finds such evidence exists in this case. First, a dissenting judge on the *Hawkins* panel noted that the Colorado Supreme Court had previously held

that a licensed physician has no constitutional or statutory right to practice his profession and had upheld a resolution by the board of a county hospital excluding osteopaths from practicing at the hospital. *Hawkins*, 540 P.2d at 350 (VanCise, J., dissenting) (citing *Newton v. Bd. of County Comm'rs*, 86 Colo. 446, 282 P. 1068 (1929)). The dissenting judge also noted that "the overwhelming weight of authority, almost approaching unanimity, is that a private hospital has the right to appoint and remove members of its medical staff at will, and in its discretion to exclude certain members of the medical profession from practicing in the hospital, and that these rights are not subject to judicial review." *Id.* (citing cases) (quotation marks omitted).

In a more recent case, the Colorado Court of Appeals considered whether physicians who had been denied staff privileges at a private hospital were entitled to mandamus relief. *Green v. Bd. of Dirs. Of Lutheran Med. Ctr.*, 739 P.2d 872, 874 (Colo. App. 1987). The court of appeals noted that mandamus relief is "available if a party has been 'unlawfully precluded' from the 'enjoyment of a right . . . to which he is entitled.'" *Id.* (quoting with alteration C.R.C.P. 106(a)(2)). In holding that the plaintiff physicians were not entitled to such relief as a matter of law, the court concluded that "denial of staff privileges is a matter solely within the discretion of [the hospital's] managing authorities." *Id.* This case conflicts with the prior holding in *Hawkins* limiting a private hospital board's discretion in granting or denying staff privileges.

Finally, the Court notes that *Hawkins* has not been cited by any Colorado court since it was issued in 1975. This fact, that no other court has followed the majority opinion in *Hawkins*, combined with the rationale of the dissenting opinion in *Hawkins*, the *Newton* decision cited by the dissent, and the more recent *Green* decision, amounts to convincing evidence that the Colorado Supreme Court would not follow *Hawkins* and would hold that no cause of action exists under

Colorado law for unreasonable denial of privileges. Thus, Defendant is entitled to summary judgment on this claim also.

IT IS THEREFORE ORDERED THAT:

1. Defendant's Motion for Summary Judgment is granted as to Plaintiffs' claims of:

    a. Unlawful monopolization in violation of § 2 of the Sherman Act and the Colorado Antitrust Act of 1992 (Counts I and III);

    b. Attempted monopolization in violation of § 2 of the Sherman Act and the Colorado Antitrust Act of 1992 (Counts II and III);

    c. Illegal conspiracies and exclusionary practices in violation of § 1 of the Sherman Act and the Colorado Antitrust Act of 1992 (Counts IV and V);

    d. Violation of the Colorado Consumer Protection Act (Count VIII);

    e. Colorado Common Law Civil Conspiracies (Count IX);

    f. Tortious Interference with Existing and Prospective Contractual Relations (Count X);

    g. Promissory Estoppel (Count XI); and

    h. Arbitrary, Capricious and Unreasonable Denial of Privileges (Count XII).

2. A decision is deferred on Defendant's Motion for Summary Judgment as it relates to Plaintiffs' antitrust claims of an illegal tying arrangement (Counts VI and VII); and

3. A partial summary judgment will be entered coincident with the filing of this Memorandum Opinion and Order.

_____
SENIOR UNITED STATES DISTRICT JUDGE