IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

FOUR CORNERS NEPHROLOGY
ASSOCIATES, P.C., a New Mexico
professional corporation;
and MARK F. BEVAN, M.D.,

   Plaintiffs,                Civ. No. 05-2084 JAP-LFG

v.

MERCY MEDICAL CENTER OF DURANGO,
a Colorado not-for-profit corporation,

   Defendant.

## MEMORANDUM OPINION AND ORDER ON PLAINTIFFS' TYING CLAIMS

This case involves claims by Plaintiffs that Defendant Mercy Medical Center ("Mercy") has engaged in restrictive trade practices by revoking Dr. Mark Bevan's staff privileges at Mercy, and entering into an exclusive contract with Dr. Mark Saddler for the provision of nephrology physician services at Mercy.

By Memorandum Order and Opinion entered March 4, 2008 (Doc. No. 188), this Court granted in part Defendant's Motion for Summary Judgment (Doc. No. 88), directing the entry of summary judgment on Counts I through V and on Counts VIII through XII of Plaintiffs' Second Amended Complaint (Doc. No. 50). That Memorandum Opinion and Order sets forth the nature of Plaintiffs' claims, and the various issues raised by Defendant's Motion for Summary Judgment. In that Memorandum Opinion and Order, the Court expressly deferred ruling on Defendant's Motion for Summary Judgment with respect to Counts VI and VII, the so-called tying claims alleged in Plaintiffs' Second Amended Complaint.

On March 10, 2008, the Court held a status conference with respect to the scheduling and trial of this case, and at the same time heard argument from counsel regarding the tying claims. In a subsequent Order (Doc. No. 193) entered on April 4, 2008, the Court directed the Plaintiffs to identify any case in which a court had held an exclusive contract between a hospital and a provider to be an illegal *per se* tying arrangement. The Court also directed the parties to file briefs on the issue of whether the Court had discretion to disregard the opinion of Plaintiffs' expert witness on the relevant geographic market (Doc. No. 193).

On or about April 10, 2008 counsel for the parties supplied letter responses to the first part of the Court's April 4, 2008 Order regarding case law holding exclusive contracts between hospitals and providers to be *per se* illegal. Plaintiffs' letter was entered on the Court Docket as a letter brief (Doc. No. 198); Defendant's letter was not so entered. On April 14, 2008, the parties filed supplemental briefs on the question relating to the Court's discretion to reject expert witness opinions on the issue of the relevant geographic market (Doc. Nos. 200, 201).

On April 21, 2008, the Court sent another letter to counsel for the parties requesting clarification of certain factual issues, unresolved in the record, regarding the treatment of patients at Mercy Medical Center of Durango. Counsel for Plaintiffs and Defendant submitted answers to the Court's questions by letters dated April 25, 2008 and April 29, 2008, respectively. Neither the Court's April 21, 2008 letter nor counsels' letter responses were recorded in the docket of the Court.

By letter dated May 13, 2008, counsel for Plaintiffs notified the Court of what he described as "an error" in the statistics and information contained in the report of Plaintiffs'

expert, Dr. Thomas McCarthy, and effectively requested permission to revise the report.[1] Defendant objected, arguing that the Magistrate Judge had ruled that there would be no supplemental reports or addenda. The Court held a telephonic hearing on May 14, 2008 on Plaintiffs' proposed revisions and Defendant's objection, and directed that Dr. McCarthy submit a supplement or errata explaining the errors in his report and the need for the corrections (Clerk's Minutes, Doc. No. 203 at 2). On May 15, 2008, Plaintiffs' counsel advised the Court that Dr. McCarthy would complete the letter by May 19, 2008 (Clerk's Minutes for March 15, 2008 Hearing (Doc. No. 204)). By letter dated May 19, 2008, Plaintiffs' counsel transmitted to the Court Dr. McCarthy's May 17, 2008 letter (nine pages with attached Exhibit A) which corrected errors in Dr. McCarthy's earlier reports.

Having considered filings of record, the other information provided by counsel, and the arguments of counsel set forth in the briefs filed in support of and in opposition to the Defendant's Motion for Summary Judgment, as well as the statements made by counsel at the March 10, 2008 hearing, the Court now concludes that the Defendant's Motion for Summary Judgment should be granted as to the tying claims.

**Legal Framework**

Plaintiffs alleged that the Defendant engaged in a *per se* illegal tying arrangement in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (Count VI), and the Colorado Antitrust Act of 1992, Colo. Rev. Stat. § 6-4-101-122 (2007) (Count VII). The Colorado Supreme Court has held that because of the "substantial similarity in text and purpose present in the federal and state antitrust statutes . . . federal decisions construing the Sherman and Clayton Acts, although

---

[1]Plaintiffs' counsel sent with his May 13, 2008 letter statistical exhibits and a May 13, 2008 Declaration of Thomas R. McCarthy.

3

not necessarily controlling on our interpretation of the Colorado law, are nevertheless entitled to careful scrutiny in determining the scope of the state antitrust statute." *People v. North Ave. Furniture & Appliance, Inc.*, 645 P.2d 1291, 1295–96 (Colo. 1982).

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product." *Eastman Kodak v. Image Technical Servs., Inc.*, 504 U.S. 451, 461 (1992) (quotation omitted). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). A *per se* tying arrangement results "if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied product market." *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 63 F.3d 1540, 1546 (10th Cir. 1995) (*citing Eastman Kodak*, 504 U.S. at 462).

When the seller does not have "the degree or the kind of market power" that justifies finding a *per se* tying arrangement, "an antitrust violation can be established only by evidence of an unreasonable restraint on competition in the relevant market." *Jefferson Parish*, 466 U.S. at 17–18. In this case, Plaintiffs have only alleged federal and state antitrust violations based on a *per se* illegal tying arrangement. (*See* Second Am. Compl., Counts VI & VII, at 26–28.). Thus, the Court's analysis is limited to that *per se* claim.

Under the framework discussed above, the Tenth Circuit has set forth the elements of a *per se* tying violation as follows: "(1) two separate products, (2) a tie—or conditioning of the sale of one product on the purchase of another, (3) sufficient economic power in the tying

4

product market, and (4) a substantial volume of commerce affected in the tied product market." *Multistate Legal Studies*, 63 F.3d at 1546. In addition, where a third party sells the tied product, the seller of the tying product must have a direct economic interest in the sale of the tied product. *Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249, 1265–66 (10th Cir. 2006).

### 1. Existence of Separate Products

Plaintiffs clarified at the March 10, 2008 hearing that the alleged tying product is hospital inpatient dialysis services and the alleged tied product is inpatient nephrology physician services. The question of whether one or two products are involved in a tying arrangement claim "turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish*, 466 U.S. at 19. In *Jefferson Parish*, the Supreme Court evaluated whether a hospital, which had an exclusive contract with a group of anesthesiologists, had illegally tied the provision of anesthesiological services (the "tied product") to the provision of hospital operating room services (the "tying product"). The Supreme Court noted that, for a tying arrangement to exist, there must have been "a sufficient demand for the purchase of anesthesiological services separate from hospital services to identify a distinct product market in which it is efficient to offer anesthesiological services separately from hospital services." *Id.* at 21–22. In holding that there was such a demand, the Supreme Court noted that "the anesthesiological component of the package offered by the hospital could be provided separately" and that the record supported the conclusion that "consumers differentiate between anesthesiological services and the other hospital services provided by [the hospital]." *Id.* at 22–23.

5

Under the *Jefferson Parish* framework, the alleged products at issue here—inpatient hospital dialysis services and nephrology physician services—appear to constitute separate products. Dialysis, whether performed in a hospital or an outpatient setting, is a technical procedure performed by nurses. There is no practical reason why the dialysis component of the inpatient treatment could not be offered separately from the nephrologist's services, notwithstanding the fact that Mercy does not actually bill its patients separately for these services.[2] In addition, from a consumer perspective, there appears to be a legitimate, separate demand for the professional physician nephrology services. Indeed, because kidney conditions often involve ongoing treatment over a long period of time (Second Am. Compl. ¶ 15), the relationship between a patient and his or her nephrologist is presumably more significant than that between a patient and his or her anesthesiologist, as the latter would involve only sporadic interactions. Moreover, according to Dr. Bevan, "at most hospitals, a patient who is admitted . . . and is using the hospital's dialysis equipment usually can choose the nephrologists he or she wants to use." (Bevan Aff., Ex. A3 to Pls.' Summ. J. Resp., ¶ 30.)

Mercy also contends that there is no tying arrangement because Mercy does not in fact provide inpatient dialysis services, the alleged tying product, but instead outsources those services to DaVita, Inc. for a fee and does not separately charge patients for dialysis. (Dignum Dep. at 29, 33; Tramontana Aff. ¶ 4.) However, regardless of whether Mercy pays a contractor rather than an employee to administer inpatient dialysis services, Mercy includes those services as part of the package for patients who require dialysis while hospitalized. Moreover, the fee charged to those patients includes any dialysis services they received. Thus, the Court is not persuaded that Mercy does not provide the tying product.

---

[2] The inpatient dialysis services at Mercy are provided by a third party, DaVita, Inc.

## 2. Conditioning Requirement

Under this requirement, "'purchases of the tying product must be conditioned upon purchases of a distinct tied product.'" *Multistate Legal Studies*, 63 F.3d at 1548 (*quoting Cont'l Trend Res., Inc. v. Oxy USA, Inc.*, 44 F.3d 1465, 1481 (10th Cir. 1995)). This requirement forecloses a claim by Plaintiffs that a second tying arrangement exists, one in which the tying product is inpatient hospital services generally, and the tied product is inpatient nephrology physician services. There does not appear to be any dispute that the vast majority of Mercy's inpatients do not receive nephrology physician services; therefore, Plaintiffs cannot reasonably argue that consumers are required to purchase the tied product in order to also purchase the tying product. *See White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 103–04 (4th Cir. 1987) (rejecting tying arrangement claim with alleged tying product of hospital medical and surgical services and alleged tied product of CT scanning services); *Coastal Neuro-Psychiatric Assocs., P.A. v. Onslow County Hosp. Auth.*, 607 F. Supp. 49, 53 (E.D.N.C. 1985) (rejecting claim that patients who used hospital's services were forced to use the hospital's CAT scan equipment because only those patients who needed a CAT scan were required to use the equipment).

However, whether this conditioning requirement is met is a closer question when the alleged tying product is defined as only inpatient dialysis services, and the tied product is

7

nephrology physician services.[3] It is certainly much more likely that a patient receiving dialysis services while hospitalized would also require the services of a nephrologist. The degree of overlap was not apparent from the record at the time of the summary judgment hearing on March 10, 2008. At the hearing, Defendant's counsel provided information suggesting that a patient hospitalized at Mercy could receive inpatient dialysis without the need for nephrology physician services, and that inpatient dialysis services were not necessarily linked with nephrology physician services. (*See* Hr'g Tr. at 33–36, 52–53.)

However, in his letter to the Court dated April 29, 2008, counsel for Defendant candidly admitted his error, stating that "an order for specific dialysis that occurs in the hospital is required to be signed by a physician with treating privileges at Mercy." (Apr. 29, 2008 Letter at 2.) This information was confirmed by the sworn declaration of Dr. Mark Saddler, dated April 29, 2008, tendered with Defendant's counsel's letter. Accordingly, Plaintiffs appear to have come forward with, or at least the record reflects, some evidence that the second, or conditioning, element of a *per se* tying claim is met.

---

[3] Mercy correctly notes that Plaintiffs alleged in their Second Amended Complaint that the tying products were "hospital inpatient services" and "inpatient nephrology services." (Second Am. Compl. ¶¶ 107–09.) Mercy argues that Plaintiffs should not be permitted to further amend their complaint at the late date of the summary judgment hearing to narrow the proposed market for the tying product. *See Leyba v. Renger*, 874 F. Supp. 1229, 1238 (D.N.M. 1994) (refusing to allow the plaintiff to amend his complaint to narrow his definition of the relevant product market with respect to a § 2 monopolization claim by alleging the narrower market for the first time in his summary judgment response, which was filed more than two years after complaint was filed). "A motion to amend may properly be denied when there has been undue delay in moving for leave to amend or when amendment would be futile." *Id.* (*citing Foman v. Davis*, 371 U.S. 178, 182 (1962)). However, given the apparent lack of prejudice to Mercy, the tying product should be considered as argued by Plaintiffs in their summary judgment briefing and at the hearing.

### 3. Market Power in Tying Product Market

Under the third element, Plaintiffs must establish that Defendant Mercy "has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and [that] a 'not insubstantial' amount of interstate commerce is affected." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958). As explained in *Jefferson Parish*, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish*, 466 U.S. at 12. Without such market power in the market for the tying product, no antitrust concerns are warranted, because "[p]urchasers desiring the tying product who do not want the tied product, or want to purchase the tied product from someone other than the designated physician source, will simply purchase the tying product elsewhere." 2 Health Care & Antitrust Law § 11:6 (2008).

Accordingly, Plaintiffs must demonstrate that Mercy has market power with respect to inpatient dialysis services, the alleged tying product. Proving such market power requires Plaintiffs first to establish the relevant product and geographic markets, for the tying product as well as the tied product. *See, e.g., Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters., Inc.*, 672 F. Supp. 1489, 1510 (D.S.C. 1987), *aff'd*, 846 F.2d 70 (4th Cir. 1988); *see also Jefferson Parish*, 466 U.S. at 26–27 (analyzing hospital's market power over tying product within a relevant geographic market); *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962) (conducting similar analysis of market power under the Clayton Act). Plaintiffs' Second Amended Complaint describes the relevant geographic market for inpatient dialysis services as "Durango, Colorado,

9

as well as portions of La Plata, San Juan, and Archuleta counties in Colorado." (Second Am. Compl. ¶ 111.)

The relevant geographic market depends on the type of product and the geographical characteristics of an area, but the relevant geographic market must identify the area of effective competition that the defendant encounters when it offers its product or service for sale. It is the geographic area in which a purchaser can practically turn for products or services. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).

As noted in *Drs. Steuer & Latham, P.A.*, the Federal Trade Commission has stated that "the boundaries of a relevant geographic market in the context of the hospital industry depend upon barriers to entry and the ability of consumers to switch to other hospitals." 672 F. Supp at 1511 (*citing In re Hosp. Corp. of Am.*, No. 9161, 106 F.T.C. 361, *216 (1985)). The burden of proof is upon Plaintiffs to establish the relevant geographic market. *Id.*

As Defendant Mercy now argues, Plaintiffs' expert report extensively addresses a relevant geographic market for the provision of nephrology physician services, the allegedly tied product. (*See* Expert Report of Dr. McCarthy (Doc. No. 96 App. 2) at 5, 10–17). Indeed, Dr. McCarthy concludes that the Durango primary service area represents the "appropriate relevant geographic market." (*Id.* at 17.) Notably absent from Dr. McCarthy's expert report, however, is analysis or evidence of the geographic market for the delivery of inpatient dialysis services, that is, the alleged tying product. *See Drs. Steuer & Latham, P.A.*, 672 F. Supp at 1511 (holding that a service area is not equivalent to a geographic antitrust market, and that plaintiff has the burden of introducing evidence regarding patient demand and barriers to entry necessary to establish the geographic market). Thus, even if the Court accepts the analysis of Plaintiffs' expert for

summary judgment purposes,[4] that analysis does not provide support for a necessary element of Plaintiffs' tying claim, namely that Defendant has power in the market for the alleged tying product.

Moreover, in discussing the issue of market power at the summary judgment hearing, Plaintiffs' counsel argued:

> [Mr. Feller]: Now, the second point is on the market power. In the evidence that we presented, Your Honor, one, Mercy has the only inpatient dialysis unit in Southwest Colorado. It's the only one now. We assume that is the relative geographic market. It is the only one with [100] percent of the inpatient dialysis services in Southwest Colorado.
>
> Now granted, obviously the relative geographic market is an issue here. But if you assume for this purpose that that's the market, it certainly has monopoly power of the inpatient [dialysis] services business.
>
> Dr. Boyd, who is the chief medical officer, testified, and we cited this in our brief, that Mercy's market share in all of its services, including nephrology services, was in the range of 85 to 95 percent. And that was in the exhibit that was attached to the briefing of summary judgment.

(Hr'g Tr. at 75.)

Thus, though Plaintiffs assert there is evidence that Mercy has a very high market share in *a* geographic market, they simply *assume* that it has market power in the *relevant* geographic market for the tying product.

The Court finds this evidence insufficient to satisfy Plaintiffs' burden. There is no dispute that the hospital in Farmington, New Mexico has an inpatient dialysis unit. Although this hospital is in New Mexico rather than Colorado, according to Dr. Bevan's testimony it is only 45 to 50 miles from Mercy. (Bevan Dep. at 60, 115.) Notwithstanding Dr. McCarthy's recent

---

[4]As noted above, the Court requested briefing on the issue of whether it may disregard the expert's geographic market analysis. However, the lack of analysis in the expert's report of the relevant geographic market for the tying product essentially moots the need for the Court to decide that question.

11

emendations to his data, it is undisputed that at least two patients from a particular Durango zip code received inpatient dialysis at the Farmington Hospital on at least three occasions in January and February 2006 (Letter from Pls.' counsel dated May 13, 2008 and attached Decl. of Dr. McCarthy ¶ 3; Letter from Pls.' counsel dated May 19, 2008 and attached letter from Dr. McCarthy dated May 17, 2008, at 2). By annualizing these data, the parties estimate that at least twelve separate Durango patients, or 36 Durango patient visits, receive inpatient dialysis services at the Farmington Hospital each year. In addition, these data include only patients residing in one zip code in the Durango area, and the number of patients may increase if other nearby zip codes were included. Although anecdotal, this evidence suggests that some patients can "practically turn" to the Farmington Hospital for inpatient dialysis services, and, in fact, have chosen to do so. Although these numbers are small, the Court notes that only four of Plaintiff Dr. Bevan's patients received inpatient dialysis services at Mercy during the twelve-month period following the Defendant's entry into the exclusive contract with Dr. Saddler and DaVita (August 2005 through July 2006). (*See* Letter from Def.'s counsel dated April 29, 2008 and attached Decl. of Dr. Saddler ¶ 4).)

On the record before the Court, Plaintiffs have failed to meet their burden of raising a genuine issue of material fact as to Mercy's market power with respect to inpatient dialysis services. Absent such a threshold showing of market power, Plaintiffs' *per se* tying claims must fail. Therefore, it is unnecessary for the Court to evaluate the fourth element of the tying claim—whether the purported conditioning of the two products results in effecting a substantial

volume of commerce in the market for the tied product.[5]

IT IS THEREFORE ORDERED THAT:

Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiffs' claims of *per se* tying arrangements in violation of section 1 of the Sherman Act and of the Colorado Antitrust Act of 1992 (Claims VI and VII). The Court will entered final judgment on behalf of Defendant as to all counts, and dismiss Plaintiffs' Second Amended Complaint (Doc. No. 50) with prejudice.

*[signature]*

--------------------------------
SENIOR UNITED STATES DISTRICT JUDGE

---

[5]However, the Court notes that Plaintiffs failed to submit evidence that the alleged tying arrangement affects a "substantial volume of commerce in the tied product market." *See Multistate Legal Studies*, 63 F.3d at 1546. Just as Plaintiffs must establish the relevant geographic market for inpatient dialysis services as a component of their market power evidence, they must also establish the relevant geographic market for the tied product, inpatient physician nephrology services. As a result of Plaintiffs' failure to submit sufficient evidence on the relevant geographic market, the Court finds that there is no genuine issue regarding Defendant's market power in both the tied and tying product markets.

13